The opinion of the court was delivered by
DeBlanc, J.
In 1842, on the 7th of December defendant — then a slave — brought forth a child wlm — as herself — was a slave. With her consent and the permission of her mistress, that child was — on the 19th of February 1844 — baptized under the name of Philippe, and as being the illegitimate son of Fillette Lafontaine, a free person. He was then baptized, for the reason — as said by his mother on the trial of this cause —that, otherwise, he would not have been free.
He grew near his mother and lived with her until he was about sixteen years of age. She sent him to school, and being remarkably intelligent, as shown by his letters, he progressed rapidly in his studies, attracted the attention of one Alexander Marionneau, who became intensely attached to him, and determined — after consulting with and obtaining the assent of his mother and of his mistress — to remove him from this State, where he was exposed to pass from the possession of a friendly owner under the control of less tolerant masters. When about to return to France, Marionneau, whose intention was — not jnerely to secure the freedom of Philippe — but to conceal the irregularity of his birth, the -misfortune of his condition, concluded that bis name and status should be changed. It was then that he and one Cam-panel — deceiving a priest and the Recorder of births — caused two false entries to be made; in and by which the pretended son of Fillette Lafontaine was represented as the legitimate issue of the marriage of Banks Dunbar with Anna Philippe.
■ This done, Marionneau — who had some property in this City— appointed as his agent and to take charge of it, one Louis Neel, the husband of plaintiff; and — in 1858 — with legalized certificates of the false entries already referred to — left for France, accompanied by William Dunbar, the son of Pélagie.
That Marionneau, Campanel and defendant were guilty of a fraud. *809 we do not deny; but that fraud was perpetrated with the aid and sanction of those who alone could have complained of it, and it is too late to denounce it.
Marionneau died in France, on the 13th of April 1861, and — by his last will — the inconsiderable property which he owned here passed to William Dunbar, who retained Louis Neel as his agent. He was — by that agent and by plaintiff herself — recognized as the son of Pélagie and the owner of the property which had belonged to Marionneau. Shortly after the death of the latter, Dunbar was penniless, and — as he had ever done — he worked incessantly to get a livelihood. Overtaken by sickness, he wrote the most imploring letters to obtain the revenues •which — he thought — and which, in all probability, his agent had derived from the lease of his property in New Orleans; but he wrote in vain. Prostrated by an accidental' consumption, he entered an hospital in Paris, and there he died on the 12th of March 1867, possessed of naught but his clothes and ten cents.
More than eight years after — on the 17th of April 1875 — Pélagie Hibard was, by a decree of the second district Court, recognized as the sole heir of William Dunbar, and ordered to be put in possession of his estate. Two days after the rendition of that decree, Joseph Flores called on plaintiff, with a copy of said judgment, and demanded, in Pélagie’s name, possession of the property which had been left in charge of Louis Neel — at first by Alexander Marionneau, and — at his death — by William Dunbar.
Nearly thirteen months after that demand, the widow of Louis Neel filed an action in the second district Court, in which she alleges that the decree which recognizes Pélagie as the sole heir of William Dunbar was improvidently rendered, without any evidence to sustain it and through the misrepresentations of Pélagie: that she is aggrieved by said decree, has an interest in attacking it and prays that it be rescinded and annulled.
How is she aggrieved ? Pélagie is disturbing her in what she terms “ the legal and peaceable possession of a lot of ground and improvements thereon.” That lot and those improvements are the same which —from 1858 to 1861 — Louis Neel held in no other capacity than as agent of Marionneau, thereafter as the agent of William Dunbar, and his widow’s pretension is as extravagant as unjust.
Those who possess as she does, can not acquire a legal possession, because it can not be presumed that they had the intention of possessing for .themselves, and even if they did entertain that dishonest intention,‘their possession continues to be that of the person for whom they originally took it.
R. C. C. 943, 3441, 3446, 3489, 3490, 3433.
*810 An action can be brought by only those who have a real and actual interest which they pursue, and plaintiff has completely failed to show how-she was or can be aggrieved by the effects or the execution of the judgment which she seeks to annul.
C. P. 15.
Mrs. Neel’s counsel contends that — not only Pélagie has not acknowledged William Dunbar as her son, but — on the contrary — has denied that fact from his birth. To justify that reproach, he refers to the misrepresentations resorted to, for the purpose of securing the freedom of her child and concealing his origin. Her participation in that fraud did —in no way — deprive her of any right to which she may be entitled as the mother of the deceased.
To sustain her action in nullity, plaintiff relies on articles 203, 922 and 929 of the Revised Code, which provide — the first, “that the acknowledgment of an illegitimate child shall be made by a declaration, executed before a notary public, in presence of two witnesses, by the father and mother or either of them, whenever it shall not have been made in the registering of the birth or baptism of such child — the others, that the estate of a natural child deceased without posterity belongs to the father and mother who have acknowledged him, and — in default of acknowledged relations — to the State.
William Dunbar died in 1867. The Code of 1825 was then in force, and not a single provision of that Code, concerning the acknowledgment of illegitimate children and their successions, can be justly invoked against those of our slaves who were emancipated after the war. At the birth of her son, Pélagie was a slave and she would not have been allowed to make such an acknowledgment. When slavery was abolished, her absolute incapacity fell, and — as all free persons, even minors, lunatics, persons of insane mind and the like, she became invested with the right of inheriting.
Code of 1825, article 945.
The deceased’s mother was not married and he was a bastard. Is that any concern of plaintiff? That mother’s concubinage, the illegitimacy of her son, were the almost inevitable results of their condition, and as that condition was not of their choice, but one imposed by the laws of the State, the maternity of the slave — though hatched in a not prohibited concubinage, can not be invoked as a crime against the emancipated-mother, and can assuredly not authorize the widow of her son’s agent to despoil the concubine, and to keep as her own the property of the bastard.
We do not hesitate to hold that a female slave, whose child was born before the general emancipation which followed the war, who has acknowledged that child in the only mariner in which she could have *811 done so, by nursing him, by treating him as such, and who — by him— has always been recognized as his mother, is certainly entitled to his succession to the exclusion of at least the State; unless, perhaps, the succession thus claimed would have been opened after the revision of the Code of 1825. . .
Were plaintiff to succeed in her attempt, what would she gain? The harsh and barren satisfaction to dispossess a mother, and-for whose benefit? Not her own, but that of the State. Thus, the very authority on which the party relies, clearly demonstrates that she has — not only no real or actual interest, but not even a prospective or eventual interest in the matter, unless it be to retain — and forever — in disregard of law and justice — the property entrusted to their care, and which she and her husband have enjoyed, without the form of a title or shadow of a right, for more than ten years.
It is, therefore, ordered, adjudged and decreed that the judgment appealed from be and it is hereby annulled, avoided and reversed, and plaintiff’s demand rejected at her costs in both courts.